## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BRIAN CHANEY,

      Plaintiff,

                                      Civil Action No. 21-11662

v.                                HON. JONATHAN J.C. GREY

KEEGO HARBOR POLICE
DEPARTMENT AND OFFICER
RICHARD LINDQUIST,

      Defendants.

_____/

### ORDER GRANTING IN PART AND DENYING IN PART LINDQUIST'S MOTION FOR SUMMARY JUDGMENT (ECF No. 33) AND GRANTING KEEGO HARBOR POLICE DEPARTMENT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 38)

## I.    INTRODUCTION

Plaintiff Brian Chaney filed this five-count civil rights action against defendants Keego Harbor Police Department ("Keego Harbor") and Richard Lindquist, a police officer for Keego Harbor, on July 16, 2021. The cause of action stems from an interaction between Lindquist, a police officer for Keego Harbor, and Chaney on July 14, 2021. Lindquist, among other things, stopped Chaney as Chaney was walking down

Orchard Lake Road in Keego Harbor, Michigan, then detained Chaney for approximately 14 minutes. Lindquist kept Chaney in handcuffs for 10 minutes of that detention period.

On September 8, 2022, Lindquist and Keego Harbor filed separate motions for summary judgment. (ECF Nos. 33, 38.) The motions have been fully briefed. This case was recently reassigned to the undersigned, and a hearing was held on September 19, 2023. For the reasons that follow, Lindquist's motion is **GRANTED IN PART AND DENIED IN PART**, and Keego Harbor's motion is **GRANTED**.

## II.   BACKGROUND

Lindquist first observed Chaney on July 14, 2021, at approximately 6:15 a.m., when Chaney was walking on a sidewalk along Orchard Lake Road in Keego Harbor. (ECF No. 33, PageID.401–402 (Ex. 3 at 46–47).) According to Lindquist, **Chaney was wearing jogging pants and a hoodie**, **with the hood over his head and covering his face, and one hand was balled up in his pocket**. (*Id.*) **Chaney was carrying a cup of coffee with a straw in it** (ECF No. 46, PageID.1326–27 (Ex. 2 at 57–58)), and he had headphones in his ears. (ECF No. 33, PageID.376 (Ex. 1 at 101).) As Chaney walked on the sidewalk, he passed Lindquist,

2

who was parked on a side street (Maddy Lane) in a marked Keego Harbor Police Department vehicle. (ECF No. 33, PageID.401 (Ex. 3 at 47).) Lindquist recognized that Chaney was African American when Chaney initially walked past him because he could see Chaney's hand on the coffee cup. (ECF No. 46, PageID.1326–27 (Ex. 2 at 57–58).) **Lindquist states that Chaney purposefully looked away from Lindquist in response to seeing the marked vehicle**. (ECF No. 46, PageID.1327 (Ex. 2 at 60–61).) **Lindquist did not do anything at this time, but he found "it an odd set of circumstances" at that point**. (ECF No. 46, PageID.1327 (Ex. 2 at 58). **After Chaney reached the Dunkin' Donuts parking lot two to three blocks away, Chaney allegedly turned around and looked right at Lindquist and/or the patrol car**. (ECF No. 33, Page ID.412–14 (Ex. 3 at 69–71).) Lindquist "just let it go at this point" because Lindquist still had "no basis to have reasonable suspicion that . . . Chaney was about to commit a crime at that point." (ECF No. 46, PageID.1329 (Ex. 2 at 72–73).)

Lindquist then drove up and down Orchard Lake, first going in the opposite direction of Chaney. (*Id.*) When Lindquist next saw Chaney about 6:19 a.m., **Lindquist was in his patrol car approaching the**

**Dunkin' Donuts on Orchard Lake Road**. (ECF No. 46, PageID.1329 (Ex. 2 at 73).) Lindquist testified that **"it appeared like [Chaney] was crouched but he was behind a parked car and seemed—as I was driving by he didn't seem to be doing anything with the car, didn't seem to have any affiliation with the car, wasn't getting into the car, wasn't interacting with anybody at the car, was just kind of standing there which now my suspicions are starting to build higher. At this point I still don't stop him**. (*Id.*) **Lindquist testified that he did not have enough reasonable suspicion "in my head at that this point" that Chaney was about to commit a crime.** (*Id.*)

The car was one of two cars initially visible in the parking lot in front of Dunkin' Donuts. (ECF No. 33, Ex. 2 (Dunkin' Donuts video camera).)[1] The car was facing Orchard Lake Road, across the parking lot from the entrance to Dunkin' Donuts, not close to the other visible car, and it appears to be less than 15 feet from Orchard Lake Road. (*Id.*) The Dunkin' Donuts video shows that Chaney "stopped" behind the vehicle

---

[1] A third vehicle (a truck with a trailer) entered the parking lot right before Chaney walked past the vehicle behind which Chaney "stopped." *Id.* at 06:18:15. The third vehicle parked alongside the Dunkin' Donuts building, across the parking lot from the vehicle behind which Chaney "stopped." *Id.* at 06:18:15–06:18:30.

facing Orchard Lake Road, which was in open view during broad daylight, for less than five seconds. (*Id.* at 06:18:31–06:18:36 on the Dunkin' Donuts camera (not the playing time on Ex. 2).) On the Dunkin' Donuts video, it appears that, rather than stop behind the vehicle, Chaney paused once or twice. (*Id.*) By the time Lindquist drove past the vehicle, Chaney was moving again. (*Id.* at 6:18:36.)

Lindquist immediately turned into the Dunkin' Donuts parking lot, drove around the Dunkin' Donuts, and then drove alongside the drive-thru lane of the Dunkin' Donuts. (*Id.* at 6:18:52–06:19:07.) **Lindquist testified (and repeatedly stated during the stop and detention of Chaney) that when Lindquist pulled through the drive-thru, Chaney "started to walk away and effectively ran away and then ran behind the building that I was sitting . . .**" (ECF No. 46, PageID.1330 (Ex. 2 at 74).) Lindquist further testified that Chaney began to run when Chaney "was still close to the car," "5, 10 feet" from the car, and still in the Dunkin' Donuts parking lot. (*Id.* at 74–78.) It was at this point, and not before that point, that Lindquist concluded that he had reasonable suspicion that Chaney had committed or was about to commit a crime. (*Id.* at 78.)

On the Dunkin' Donuts video, Chaney clearly resumes walking at the same pace he had been prior to "stopping" behind the vehicle and does not begin running anywhere near the car. (ECF No. 33, Ex. 2 at 06:18:25–06:18:47.) At some point near that time, Lindquist radioed to dispatch, "got one taking off on foot . . . northbound . . . from Hester . . . ." (ECF No. 47, Ex. 11 (Dispatch Audio) at 00:14–00:19.)

Lindquist turned left out of the parking lot onto Hester and then immediately turned right onto Orchard Lake Road. (ECF No. 33, Ex. 2 (Lindquist Dash Cam) at 06:19:08; Ex. 4 at 00:52.) Lindquist promptly pulled the patrol car into a parking lot/on the sidewalk and parked the patrol car less than five yards behind where Chaney was walking on the sidewalk/a parking lot on Orchard Lake Road, between a couple of businesses on the block next to the Dunkin' Donuts block (*Id.* at Ex. 4 at 00:55–01:00.) Chaney still had the coffee cup in his hand. (*Id.* at 00:55.)

Lindquist got out of the patrol car and ordered Chaney to: "Get your hands out of your pockets." (*Id.* at 00:59–01:01.) Chaney immediately lifted both arms, the cup of coffee in his right hand. Chaney slowly approached Lindquist with his hands out, and Lindquist asked, "Do you have any weapons on you?" (*Id.* at 01:27.) Chaney shook his head no.

Lindquist then told Chaney, "I'm going to pat you down for weapons." (*Id.* at 01:32.) Chaney asked, "Why?" set his coffee down on the hood of the patrol car, and stated, "I'm walking." (*Id.* at 01:33–01:37).) Lindquist then patted Chaney down. (*Id.* at 01:38–01:42.)

After Lindquist finished patting Chaney down without finding any evidence of weapons, Chaney picked up his coffee cup and started to walk away. (*Id.* at 01:47) Lindquist asked Chaney where he was going, and Chaney responded that he was walking. (*Id.* at 01:48–01:49.) At that point, Lindquist stated, "you are not free to go, you're being detained." (*Id.* at 01:52.) Seconds later, Lindquist explained to Chaney the basis for detention, stating, "the combination of everything you are doing right now[2] leads me to believe there is criminal activity going on, you're either going to break into a car or something like that." (ECF No. 33, Ex. 4 at 01:59–02:05.)

For approximately the next two minutes, Chaney frequently was yelling and questioning Lindquist about the reasons Lindquist stopped and detained Chaney. After about two minutes, Lindquist told Chaney to

---

[2] At the hearing, Lindquist's counsel made clear that "the combination of everything you are doing right now" meant the **underlined and bolded** actions of Chaney set forth above.

turn around and handcuffed Chaney until Lindquist could figure out who Chaney was. (*Id.* at 03:48–04:00.) Over the next 10 minutes, Lindquist asked or tried to ask many questions, Chaney often yelled and repeatedly stated that Lindquist stopped and detained Chaney "because I'm a black man walking in Keego Harbor." (*See, e.g., id.* at 04:38–04:41.) Due to the radio dispatch from Lindquist that he had "one taking off on foot," officers from four other jurisdictions arrived at the scene during the course of Chaney's detention, all after Chaney had been handcuffed.

After Lindquist got a report from one of the four other officers who came to the scene that there was no lien or other issue with Chaney, Lindquist promptly uncuffed Chaney. (*Id.* at 13:40–14:00.) Lindquist attempted to talk to Chaney for the next 90 seconds, with Chaney interrupting Lindquist and yelling, such that Lindquist ultimately told Chaney to "just go." (*Id.* at 15:20.) Approximately two minutes later, the encounter ends. (*Id.* at 17:35.)

At the hearing, the defendants suggested that there was no disagreement regarding the facts of this case, such that the Court's decision would turn exclusively on the law. The Court cannot agree. There are genuine disputes about a number of material facts, including:

(a) whether Chaney's hoodie was covering his face and whether Chaney looked away when he walked by Lindquist's patrol car on Maddy Lane; (b) whether Chaney crouched behind the vehicle in the Dunkin' Donuts parking lot; (c) whether Chaney took flight, bolted, lunged, or ran from the Dunkin' Donuts parking lot immediately prior to Lindquist stopping Chaney on Orchard Lake Road; and (d) whether Chaney ran behind a building after Lindquist drove on Orchard Lake Road and turned into the Dunkin' Donuts parking lot. As set forth below, well-established Supreme Court and Sixth Circuit case law dictates that the Court must view any disputed facts in a light most favorable to the non-moving party, *i.e.*, Chaney.

## III.   LEGAL STANDARDS

### A.   Federal Rule of Civil Procedure 56

The Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322–23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

## B.   Qualified Immunity

It is well-established law that officials performing discretionary functions are shielded from liability unless the plaintiff establishes: (1) that the officer violated one of the plaintiff's constitutional rights, and (2) that right was "clearly established" when the event occurred. *See, e.g., Pearson v. Callahan*, 555 U.S. 223, 229 (2009). These two steps may be addressed in any order, but both must be answered in the affirmative for the case to go to a factfinder to decide if an officer's conduct in the particular circumstances violated the plaintiff's clearly established constitutional rights. *Id.* at 236. If either one is not satisfied, qualified immunity will shield the officer from civil damages. *Id.*

On October 18, 2021, the Supreme Court issued two decisions addressing the "clearly established" prong. In the first case, the Supreme Court stated:

> "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White* v. *Pauly*, 580 U. S. ——, ——, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (*per curiam*) (internal quotation marks omitted). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (*per curiam*) (internal quotation marks omitted). Although "this Court's case law

11

does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U. S., at ——, 137 S.Ct., at 551 (alterations and internal quotation marks omitted). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam*) (internal quotation marks omitted).

"[S]pecificity is especially important in the Fourth Amendment context, where ... it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12, 136 S.Ct. 305 (alterations and internal quotation marks omitted). Whether an officer has used excessive force depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); see also *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force"). However, *Graham*'s and *Garner*'s standards are cast "at a high level of generality." *Brosseau*, 543 U.S. at 199, 125 S.Ct. 596. "[I]n an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." *Ibid.* But this is not an obvious case. Thus, to show a violation of clearly established law, Contesluna must identify a case that put Rivas-Villegas on notice that his specific conduct was unlawful.

*Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5–6 (2021).

In the second case, the Supreme Court stated:

The doctrine of qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). As we have explained, qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 583 U. S. ——, ——, 138 S.Ct. 577, 589, 199 L.Ed.2d 453 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

We have repeatedly told courts not to define clearly established law at too high a level of generality. See, *e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). It is not enough that a rule be suggested by then-existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 583 U. S., at ——, 138 S.Ct., at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Such specificity is "especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (*per curiam*) (internal quotation marks omitted).

*City of Tahlequah v. Bond*, 595 U.S. 9, 12–13 (2021).

Finally, as the Sixth Circuit has recognized:

Qualified immunity protects Officer Kamerer from this lawsuit unless Coil establishes that Kamerer violated his constitutional rights and that those rights were clearly established. *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct.

808, 172 L.Ed.2d 565 (2009). Officer Kamerer is entitled to summary judgment if no reasonable jury could find in Coil's favor. *See* Fed.R.Civ.P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). And Coil receives the benefit of the doubt in assessing the factual record. In considering whether an officer violated a citizen's constitutional rights, we "may not call off the trial merely because an officer *says* he or she acted reasonably in the face of competing testimony. We instead consider the facts in the light most favorable to the plaintiff." *Greco v. Livingston Cnty.,* 774 F.3d 1061, 1064 (6th Cir. 2014).

*Fam. Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 604 (6th Cir. 2015) (emphasis in original).

## IV.   LINDQUIST'S MOTION FOR SUMMARY JUDGMENT

### A.   Equal Protection Claim

In support of his equal protection claim, Chaney argues that "suspicion based solely on race of the person stopped cannot give rise to a reasonable suspicion justifying a *Terry* stop." (ECF No. 45, PageID.1141 (citing *United States v. Anderson*, 923 F.2d 450, 455 (6th Cir. 1991)).) Although this is true and relevant for purposes of Fourth Amendment analysis, it does not help Chaney's equal protection claim. Chaney has submitted no evidence that Lindquist treated Chaney differently than a similarly situated person, as a plaintiff must demonstrate to prove an

equal protection violation.[3] Chaney has not identified any other person subject to – or who was not subjected to – a *Terry* stop in Keego Harbor for any reason, including based on race, age, sex, or other protected class. This failure is fatal to his claim. *See Reform Am.,* 37 F.4th at 1152 (a plaintiff is required to show that the government treated him disparately as compared to similarly situated persons and that the disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.).

Chaney's arguments that Lindquist violated Chaney's equal protection rights because Lindquist had no understanding or written direction as to what a lawful stop constitutes also does not help his claims. (ECF No. 45, PageID.1146.) Even if that is true, it reflects Keego Harbor's failure to train about what a lawful stop was. An absence of

---

[3] "To be 'similarly situated' for purposes of an equal-protection claim, the plaintiff and the comparator must be alike 'in all relevant respects.'" *Reform Am. v. City of Detroit*, 37 F.4th 1138, 1152 (6th Cir. 2022). In relation to law-enforcement practice, a plaintiff must demonstrate that the practice had discriminatory effect and was motivated by a discriminatory purpose. *Green v. City of Southfield, Michigan*, 925 F.3d 281, 285 (6th Cir. 2019). "[T]o prove a discriminatory effect, the plaintiff must show that similarly situated individuals were not subjected to the challenged police actions." *Id*. If the threshold issue of disparate treatment is not shown, then the plaintiff's claim fails. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379-380 (6th Cir. 2011).

training about what constitutes a lawful stop would only show that Keego Harbor officers such as Lindquist violate Fourth Amendment rights generally, not that race (or any other protected status) is a factor. The Court **GRANTS** Lindquist's motion for summary judgment on Chaney's equal protection claim.[4]

## B. Substantive Due Process Claim

Lindquist asserts that the averments in Chaney's substantive due process claim fall under the purview of an equal protections claim and/or a Fourth Amendment claim, rendering the substantive due process claim not viable. *See, e.g., Albright v. Oliver*, 510 U.S. 266, 274 (1994); *Eby–Brown Co., LLC v. Wisconsin Dep't of Agriculture*, 295 F.3d 749, 754 (7th Cir. 2002) ("When a particular amendment [*e.g.*, the equal protection clause] 'provides an explicit textual source of constitutional protection . .

---

[4] Chaney's relies on *Police Scorecard*, a website that "calculates levels of police violence, accountability, racial bias and other policing outcomes" for law enforcement agencies. S*ee* https://policescorecard.org/about#:~:text=The%20Scorecard%20 calculates %20levels%20of,100%25%20of%20the%20US%20population. (last checked on September 29, 2023). Chaney's reliance on *Police Scorecard* does not help his argument as the information contained therein constitutes inadmissible hearsay. *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) ("it is well established that a court may not consider hearsay when deciding a summary judgment motion."). Although some forms of hearsay may be considered (affidavits, depositions, answers to interrogatories), the evidence must be admissible at trial. *Id*. In other words, the evidence need not be in admissible form, but its content must be admissible. *Id*. at 515 (quoting *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135 (6th Cir. 1997)).

. that amendment and not . . . substantive due process, must be the guide for analyzing these claims.'") (internal quotations omitted).

Chaney's argument in support of his substantive due process claim reflects that his substantive due process averments are rooted in equal protection and Fourth Amendment rights. Chaney states, "For the same reasons discussed in argument 'I' and 'III' of Plaintiff's brief, Defendant Lindquist violated Plaintiff's Fourth Amendment right and his right to be free from harassment and be treated equal as others by individuals acting under the color of law." (ECF No. 46, PageID.1285.) Arguments I and III address the equal protection claim and Fourth Amendment claims, respectively. Accordingly, the Court **GRANTS** Lindquist's motion for summary judgment with respect to the substantive due process claim.

## C.    Fourth Amendment "Claim"

In his complaint, Chaney does not specifically allege a Fourth Amendment claim, but all of the parties have asserted or acknowledged that Chaney has pleaded a Fourth Amendment claim. Chaney alleges in the first paragraph of the Amended Complaint that he "seeks relief from Defendants for violation . . . of his rights, privileges, and immunities secured by . . . Fourth Amendment . . . ." (ECF No. 4, PageID.27 at ¶1.)

Chaney further alleges, "At all relevant times herein, Defendant LINDQUIST acted deliberately and intentionally to violate B.C.'s Constitutional, Federal and State Statutorily protected rights to be free from race discrimination and violation of his rights secured under the 14th and 4th Amendment of The Constitution of The United States." (*Id.* at PageID.29 at ¶12.)

Lindquist acknowledged in his summary judgment motion that Chaney's underlying assertion is that Chaney was unreasonably seized. (ECF No. 33, PageID.359.) Keego Harbor concedes that the Amended Complaint both mentions the Fourth Amendment and alleges that Chaney was battered and arrested. (ECF No. 38, PageID.479 (citing ECF No. 4, PageID.27, 30, 32, 33, 35, 37, 39).) For these reasons, the Court finds that Chaney pleaded a Fourth Amendment claim in his Amended Complaint. To ensure that Chaney has pleaded a clear Fourth Amendment claim, the Court will order Chaney to file a Second Amended Complaint with all remaining claims within seven days of this Order.

With respect to a Fourth Amendment claim, Lindquist contends that, if the stop was reasonable, then Chaney's Fourth Amendment claim necessarily fails. (ECF No. 33, PageID.359 (citing *Nieves v. Bartlett*, 139

S. Ct. 1715 (2019) (holding that probable cause to effectuate an arrest defeated a First Amendment retaliatory arrest claim).) Lindquist correctly argues that, under the Fourth Amendment, persons are secure from "unreasonable searches and seizures," but an officer can briefly detain a person for investigatory purposes if the officer has "reasonable suspicion" that criminal activity may be afoot. *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008). It is well-established that reasonable suspicion:

> . . . requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry* stop. Courts must examine the totality of the circumstances to determine whether reasonable suspicion existed to justify a *Terry* stop.

*Id.*

Lindquist cites numerous cases that note that nervous and evasive behavior can support reasonable suspicion, that refusal to identify one's-self could lead to probable cause to arrest under Michigan law, and that the use of some degree of physical coercion during an investigatory stop may be reasonable and warranted. (ECF No. 33, PageID.360–362 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Barrera v. City of Mount*

*Pleasant*, 12 F.4th 617, 622 (6th Cir. 2021); *United States v. McMullin*, 739 F.3d 943, 947 (6th Cir. 2014); *United States v. Craig*, 306 F. App'x 256, 258 (6th Cir. 2009); *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007); *United States v. McAllister*, 31 F. App'x 859 (6th Cir. 2002)).) Of those cases, only *Wardlow* is relevant with respect to Lindquist's initial stop of Chaney and, as noted below, is not helpful to Lindquist's position.

The Fourth Amendment claim turns on whether Lindquist executed a valid *Terry* stop. *Terry v. Ohio*, 392 U.S. 1 (1968). In this case, the Court finds that, rather than simply invoke the term "*Terry* stop," it would be instructive to look at the actual fact pattern in *Terry*. In *Terry*:

> Petitioner Terry was convicted of carrying a concealed weapon and sentenced to the statutorily prescribed term of one to three years in the penitentiary.[ ] Following the denial of a pretrial motion to suppress, the prosecution introduced in evidence two revolvers and a number of bullets seized from Terry and a codefendant, Richard Chilton,[ ] by Cleveland Police Detective Martin McFadden. At the hearing on the motion to suppress this evidence, Officer McFadden testified that while he was patrolling in plain clothes in downtown Cleveland at approximately 2:30 in the afternoon of October 31, 1963, his attention was attracted by two men, Chilton and Terry, standing on the corner of Huron Road and Euclid Avenue. He had never seen the two men before, and he was unable to say precisely what first drew his eye to them. However, he testified that he had been a policeman for 39 years and a detective for 35 and that he had been assigned to

patrol this vicinity of downtown Cleveland for shoplifters and pickpockets for 30 years. He explained that he had developed routine habits of observation over the years and that he would 'stand and watch people or walk and watch people at many intervals of the day.' He added: 'Now, in this case when I looked over they didn't look right to me at the time.'

His interest aroused, Officer McFadden took up a post of observation in the entrance to a store 300 to 400 feet away from the two men. 'I get more purpose to watch them when I seen their movements,' he testified. He saw one of the men leave the other one and walk southwest on Huron Road, past some stores. The man paused for a moment and looked in a store window, then walked on a short distance, turned around and walked back toward the corner, pausing once again to look in the same store window. He rejoined his companion at the corner, and the two conferred briefly. Then the second man went through the same series of motions, strolling down Huron Road, looking in the same window, walking on a short distance, turning back, peering in the store window again, and returning to confer with the first man at the corner. The two men repeated this ritual alternately between five and six times apiece—in all, roughly a dozen trips. At one point, while the two were standing together on the corner, a third man approached them and engaged them briefly in conversation. This man then left the two others and walked west on Euclid Avenue. Chilton and Terry resumed their measured pacing, peering and conferring. After this had gone on for 10 to 12 minutes, the two men walked off together, heading west on Euclid Avenue, following the path taken earlier by the third man.

By this time Officer McFadden had become thoroughly suspicious. He testified that after observing their elaborately casual and oft-repeated reconnaissance of the store window on Huron Road, he suspected the two men of 'casing a job, a stick-up,' and that he considered it his duty as a police officer

to investigate further. He added that he feared 'they may have a gun.'

Thus, Officer McFadden followed Chilton and Terry and saw them stop in front of Zucker's store to talk to the same man who had conferred with them earlier on the street corner. Deciding that the situation was ripe for direct action, Officer McFadden approached the three men, identified himself as a police officer and asked for their names. At this point his knowledge was confined to what he had observed. He was not acquainted with any of the three men by name or by sight, and he had received no information concerning them from any other source. When the men 'mumbled something' in response to his inquiries, Officer McFadden grabbed petitioner Terry, spun him around so that they were facing the other two, with Terry between McFadden and the others, and patted down the outside of his clothing. In the left breast pocket of Terry's overcoat Officer McFadden felt a pistol. He reached inside the overcoat pocket, but was unable to remove the gun. At this point, keeping Terry between himself and the others, the officer ordered all three men to enter Zucker's store. As they went in, he removed Terry's overcoat completely, removed a .38-caliber revolver from the pocket and ordered all three men to face the wall with their hands raised. Officer McFadden proceeded to pat down the outer clothing of Chilton and the third man, Katz. He discovered another revolver in the outer pocket of Chilton's overcoat, but no weapons were found on Katz. The officer testified that he only patted the men down to see whether they had weapons, and that he did not put his hands beneath the outer garments of either Terry or Chilton until he felt their guns. So far as appears from the record, he never placed his hands beneath Katz' outer garments. Officer McFadden seized Chilton's gun, asked the proprietor of the store to call a police wagon, and took all three men to the station, where Chilton and Terry were formally charged with carrying concealed weapons.

*Terry*, 392 U.S. at 4–7 (footnotes omitted).

In this case Lindquist asserts that he had "reasonable suspicion" that Chaney was about to break into or had broken into a motor vehicle (a felony) based on the following circumstances:

(1)   He saw Chaney wearing a hoodie when, in Lindquist's opinion, it was too warm for a hoodie;

(2)   Hoodies can be used to conceal weapons or tools;

(3)   Chaney had his hand in the pocket of the hoodie which could indicate that he was concealing a weapon or tool;

(4)   Chaney appeared to try to hide his face when he walked past Lindquist's patrol car and looked away;

(5)   After Chaney walked a block or two past Lindquist's vehicle, Chaney turned around, and appeared to look at Lindquist as if to check on Lindquist;

(6)   Chaney walked out of Lindquist's sight after appearing to check on what Lindquist was doing;

(7)   When Lindquist returned to where he last saw Chaney (the Dunkin' Donuts parking lot), Chaney was still there;

(8)   Chaney stopped near a vehicle that he did not appear to own or have an affiliation;

(9)   Chaney was walking in a parking lot despite a sidewalk being readily available to him for travel; and

(10)  Chaney appeared to be trying to conceal himself when Lindquist drove toward him.

Lindquist argues that those factors not only establish that Lindquist did not violate Chaney's constitutional rights, but they also entitle Lindquist to qualified immunity.

As to each of the above reasons Lindquist asserted as a basis for his alleged reasonable suspicion of Chaney, the Court notes that the following circumstances and information with respect to each reason also were known or should have been known to Lindquist on the morning of July 14, 2021.

(1) It was a sunny day, but as it was 6:15 a.m. and had been dark for most of the preceding eight hours, the heat one associates with the sun had not yet taken effect. Lindquist's report indicated that it was 65 degrees out. People wear different amounts of clothes for a variety of reasons, including warmth, exercising and fashion. The fact that Chaney was wearing a sweatshirt, specifically, a hoodie with the hood over his head, when it was 65 degrees outside was not abnormal and certainly is not probative of criminal activity. In fact, the person who exited the truck that pulled into the Dunkin' Donuts parking lot as Chaney was walking and pausing behind the other vehicle was wearing a long sleeve shirt. (ECF No. 33, Ex. 2 at 06:18:54–06:19:04.)

(2) Anything with pockets can be used to conceal a weapon, including a jacket, baggy pants, a purse, a backpack, etc. If the Court were to adopt Lindquist's position that a sweatshirt with a pocket contributes to reasonable suspicion, any person who wore a coat, carried a bag, purse, or backpack, or who wore any clothes that were not tight to the body, would have to be subject to heightened scrutiny, at least if they were walking down a street in Keego Harbor at 6:15 a.m.

(3)     A lot of people walk with a hand or hands in their pocket(s) or reach into their pocket(s) when walking. Without much more, this is not an indicator of suspicious activity.

(4)     Chaney testified that his face was clearly visible. (ECF No. 46, PageID.1316 (Ex. 1 at 272).) A lot of people do not want to look at the police or have the police see them, including some Blacks who see white police officers, as Lindquist, a white police officer, acknowledged. (ECF No. 46, Ex. 2 at 61–63.) The incidents of Chaney allegedly looking away from Lindquist and then looking back at Lindquist from down the street both occurred before Lindquist had <u>any</u> reason to even contemplate Chaney's actions. All Lindquist had observed by that time was that Chaney was walking on the sidewalk on Orchard Lake Road, wearing a hoodie, was black, and was holding a cup of coffee with a straw. As the Sixth Circuit, citing Supreme Court precedent, has recognized:

> **Police officers may not stop citizens minding their own business on a public street in the absence of reasonable suspicion that they have committed, or are about to commit, a crime**, *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and they may not arrest them in the absence of probable cause that they have committed a crime, *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). **Unsuspicious pedestrians remain free "to ignore the police and go about [their] business**." *Illinois v. Wardlow,* 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). And "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). **All of**

> **this establishes that "walking away from an officer does not create … reasonable suspicion**." *United States v. Beauchamp,* 659 F.3d 560, 570 (6th Cir.2011); *see Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

> . . . Sitting on a guardrail is not illegal. Doing so at night, whether on Christmas night or any other, does not transform this innocent activity into nefarious conduct. Walking away from an officer without answering his questions or revealing one's name does not establish reasonable suspicion for a *Terry* stop. And an individual's late-night presence in a high-crime area by itself does not establish reasonable suspicion of anything other than the probability that the individual lives in a high-crime area. That leaves the absence of a nearby car or any open store or business that might explain the men's presence. **But walking without evident purpose remains an innocent, even enjoyable, activity in this country, whether in a high-crime area or a suburban park**. *Papachristou v. City of Jacksonville,* 405 U.S. 156, 163–64, 171, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

*Fam. Serv. Ass'n*, 783 F.3d at 604 (emphasis added).

And, although it should go without saying, being Black in any neighborhood or on any street should be a neutral consideration. Lindquist had no basis or reason to have, as his counsel indicated, his "antennas up" or even a hunch that Chaney's actions reflected any past, present, or future criminal activity.

(5)    A lot of people, including some Blacks and people of color, wonder whether a police officer is checking on or pursuing them and looking back is hardly an indication of guilt or intent to engage in criminal activity. For some persons, there may be a "look back" to be sure that law enforcement is not pursuing them for any given reason, including because of physical features such as race, size, clothing, hairstyle, etc.

(6)    The Dunkin' Donuts camera shows Chaney walking along Orchard Lake and to and from Hester. The fact that a person is no longer in view of an officer does not, without more, give rise to reasonable suspicion, though it may be considered in the totality of the circumstances. Up to the point of Chaney turning down Hester, however, the only circumstances were, again, that Chaney was walking on the sidewalk on Orchard Lake Road, wearing a hoodie with the hood over his head, was black, and was holding a cup of coffee with a straw.

(7) (8) (9) (10) These four factors, taken together, may give a reasonable officer some basis for <u>noticing</u> Chaney, particularly as Chaney stated at his deposition that he was trying to conceal himself from Lindquist. (ECF No. 38, Ex. 4 (Chaney Dep.) at 139–140.) Chaney's activity in or near the Dunkin' Donuts parking lot/sidewalks, **as observed by Lindquist** (who had not seen the Dunkin' Donuts video), was limited to approximately 10 seconds. These circumstances, however, are the only circumstances in totality of the circumstances that could trigger even a hunch for any reasonable officer.

Any such hunch, however, would be offset by the multitude of factors set forth in the Court's discussion of Lindquist's claimed factors (1)-(6). In addition to those factors, there were numerous other factors or circumstances that Lindquist knew or should have known that further vitiated any leaping to the conclusion that he had reasonable suspicion

that Chaney was engaging in, or was about to engage in, criminal activity.

First, Chaney was carrying a cup of coffee with a straw in his hand from the time Lindquist first saw Chaney until Lindquist stopped Chaney. How many people would be, or could be, breaking into a car while carrying a cup of coffee? Even Lindquist acknowledged this. (ECF No. 46, Ex. 2 at 110.) Second, how could Chaney have bolted and run away from Dunkin' Donuts with the cup of coffee in his hand without spilling it all over his hand, himself, his sweatshirt, and/or the ground?

Third, it was daylight when Chaney was walking up and down Orchard Lake Road and through the Dunkin' Donuts parking lot. Fourth, the vehicle Chaney went behind was just off Orchard Lake Road, and there were no other cars or obstructions anywhere near that vehicle. For these two reasons, the vehicle and Chaney were clearly visible from: Orchard Lake Road, inside Dunkin' Donuts, and all other angles. Fifth, Chaney was behind the vehicle for less than five seconds. Chaney was

standing up the whole time, did not crouch down (as Lindquist contends),[5] and had the cup of coffee in his hand the whole time.

Sixth, Chaney walked at the same pace at all times prior to the stop; he did not start to run. The Dunkin' Donuts video does not show Chaney running on or from the parking lot, and Lindquist's dashcam clearly shows Chaney walking at a "comfortable" (Lindquist counsel's terminology) pace when Lindquist pulled up on Chaney. This is important because Lindquist had no reason to believe that Chaney was taking flight, had any intent to flee, or engaged in any evasive activity. *Cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (unprovoked or "[h]eadlong flight – wherever it occurs – is the consummate act of evasion."). Nonetheless during Chaney's detention and at Lindquist's deposition, Lindquist repeatedly claimed that Chaney ran from the Dunkin' Donuts parking lot.

Seventh, Chaney was walking on Orchard Lake Road when Lindquist pulled up on Chaney, only seconds after Chaney had passed behind the vehicle in Dunkin' Donuts parking lot. Chaney did not duck

---

[5] Again, the Court must view disputed facts in a light most favorable to the non-moving party, such that Chaney "receives the benefit of the court in assessing the factual record." *Fam. Serv. Ass'n*, 738 F.3d at 604; *Matsushita*, 475 U.S. at 586; *Celotex*, 477 U.S. at 323–24.

down a side street or hide behind a building (though he may have walked behind one). Instead, Chaney proceeded directly to Orchard Lake Road where anyone, including a police officer looking for Chaney, could easily see and locate him. Chaney did not run or otherwise attempt to flee when Lindquist pulled up on him, and Chaney promptly turned around after Lindquist began talking to him. Eighth, the distance Chaney traversed between the time he exited the Dunkin' Donuts video and the time Lindquist's dash cam captured Chaney walking along Orchard Lake Road was consistent with walking a comfortable pace, not the distance that might have been covered by someone running.

Finally, there is no evidence or testimony that Keego Harbor was a high-crime area or that any vehicle break-ins had been reported in the area at any time preceding July 14, 2021. As such, there was no reasonable basis for a reasonable officer to have his or her "antennas up" just because a person hesitates behind, but does not look into, a parked vehicle.

For all of those reasons, the circumstances in this case are vastly different than those in *Terry*. Most critically, in *Terry*, the officer had been assigned to patrol the area for shoplifters and pickpockets. The

officer watched Terry and Chilton for "10 to 12 minutes," saw each man individually engage in repeated patterns of unusual behavior (looking in a storefront, walking away, and then returning to the storefront before walking back to meet and talk with the other man), and observed them talk to a third man who left the immediate area, with Terry and Chilton ultimately following the same path and meeting up with the third man.

In contrast, Lindquist, who had no indication that Keego Harbor was a high-crime area or that there had been any vehicle break-ins, only saw Chaney a few intermittent times over the course of four minutes. Chaney's sole behavior that arguably could get a reasonable officer's attention was Chaney's pause behind the car in the Dunkin' Donuts parking lot as Lindquist's patrol car was driving past Chaney on the roadway. Perhaps, upon seeing that, a reasonable officer may have had a basis to begin observing Chaney, as the officer did in *Terry* for 10 to 12 minutes before approaching Terry and Chilton. No reasonable officer, however, would have believed that he or she had reasonable suspicion to stop Chaney at that point. At his deposition, Lindquist even acknowledged that he did not have enough reasonable suspicion "in my head at that this point" that Chaney was about to commit a crime. (*See*

ECF No. 46, PageID.1329 (Ex. 2 at 73).) And, as the video evidence and Chaney's testimony do not support Lindquist's claim that Chaney "bolted" or began to run from the Dunkin' Donuts parking lot when he was 5 to 10 feet from the vehicle he "stopped" behind, the Court does not consider that claim when assessing reasonable suspicion on this motion for summary judgment. *See Fam. Serv. Ass'n*, 783 F.3d at 604 (citing *Greco,* 774 F.3d at 1064 ("In considering whether an officer violated a citizen's constitutional rights, we 'may not call off the trial merely because an officer *says* he or she acted reasonably in the face of competing testimony. We instead consider the facts in the light most favorable to the plaintiff.'")).

Considering *Terry* and the totality of the circumstances and information that were known or should have been known to Lindquist when he started paying attention to Chaney, continued paying attention to Chaney, stopped Chaney, and did not let Chaney leave, even after Lindquist had patted Chaney down and not found any weapons or tools that could be used to break into vehicles (which was the only alleged basis for the stop), the Court concludes that no reasonable officer, considering the existing law and the totality of the circumstances, could have

determined that the circumstances justified a hunch—and certainly not reasonable suspicion—that Chaney was associated with any criminal activity or that criminal activity was afoot. The Court finds that there is a genuine dispute of material fact whether Lindquist had reasonable suspicion to stop Chaney.

The Court also concludes that Lindquist is not entitled to qualified immunity. In this case, the Court finds that it "sufficiently clear that every reasonable official would have understood," upon taking into consideration the totality of the circumstances known to Lindquist, that stopping Chaney would violate Chaney's right to be free from an unreasonable stop and seizure. *Mullenix*, 577 U.S. at 11 (internal quotation marks omitted). The Court finds that this is an obvious case, such that "a body of relevant case law" is not necessary. *See Rivas-Villegas*, 595 U.S. at 6 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). *See also Taylor v. Riojas*, 592 U.S. —, 141 S.Ct. 52, 53–54 (2020); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

All of Chaney's conduct (alleged or evident) after the stop, some of which <u>may</u> have justified detention or even handcuffing Chaney if there had been reasonable suspicion for the stop in the first place, is

meaningless for purposes of determining reasonable suspicion because it occurred after the initial stop. *See United States v. Johnson*, 620 F.3d 685, 696 (6th Cir. 2010) (citations omitted).  Such conduct, however, is relevant to Chaney's claims of continued violation of his Fourth Amendment rights as to his detention. The Court finds that there is a genuine issue of material fact whether Chaney should have been detained and whether the manner of detention (handcuffed, being called dog, etc.) was appropriate because, as Lindquist stated, he cleared Chaney of any suspicion of breaking into a car when he patted Plaintiff down and found no tools on Chaney. (*See* ECF No. 45, PageID.1184 (Ex. 3 at 124).)

The Court **DENIES** Lindquist's summary judgment motion as to Chaney's Fourth Amendment claim.

### D.    Official Capacity Claim

Chaney does not dispute, and the Court finds that, Chaney's "official capacity" claim against Lindquist is duplicative of the claim against Keego Harbor. Accordingly, the Court **GRANTS** Lindquist's summary judgment motion regarding Chaney's official capacity claim.

### E. State Law Claims

Lindquist claims he is entitled to governmental immunity on the assault and battery claim and the intentional infliction of emotional distress claim. In Michigan, a governmental employee is immune from intentional tort liability if: (1) the acts at issue were committed in the course of the employee's employment and the employee reasonably believed that the act was within the scope of the employee's authority, (2) the acts were made in good faith, and (3) the acts are not ministerial in nature. *See, e.g., Odom v. Wayne Cnty.*, 482 Mich. 459, 474–475 (2008). There is no dispute that elements (1) and (3) are satisfied in this case. As to the second element, an officer is not entitled to immunity if the officer acts maliciously or for an improper purpose, acts with wanton or reckless disregard for the rights of another, or is guilty of abuse of power. *Id.* at 474.

Chaney claims that Lindquist assaulted and battered Chaney when Lindquist pushed Chaney in the back, causing him to stumble and injure his groin. Chaney asserts that the actions were undertaken with malice, as evidenced by the way that Lindquist interacted with him throughout the encounter (*e.g.,* "don't play like this," "familiarize yourself with *Terry*

*v. Ohio*," "you walked your ass all the way out here from Farmington Hills," handcuffing him, lying about who Lindquist's boss was, lying that Chaney was running, and referring to Chaney as "dog").

An intentional infliction of emotional distress claim has four elements: (1) the conduct was extreme and outrageous, (2) there was intent or recklessness, (3) the action caused, (4) severe emotional distress. *See Atkins v. Farley*, 171 Mich. App. 787, 788 (1988). Lindquist argues that the first element cannot be satisfied because his actions were lawful. (ECF No. 33, PageID.369 (citing *Killian v. Fuller*, 162 Mich. App. 210, 217 (1987); *Walsh v. Taylor*, 263 Mich. App. 618 (2004)).) Lindquist argues that the second element also fails because there was no intent or recklessness to cause emotional distress to Chaney for the same reason, *i.e.*, Lindquist contends he conducted a legal investigatory stop. *Id.* (citing *Tope v. Howe*, 179 Mich. App. 91, 107 (1989).)

Lindquist argues that calling Chaney a "dog" also fails because mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are not sufficient. Citing *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 603 (1985). Lindquist further argues that "dawg" means friend

or buddy (per Merriam-Webster), so it cannot be extreme or outrageous behavior.

The Court finds that, at a minimum, there is a genuine dispute of material fact whether Lindquist acted outrageously and with malice when: (a) pushing Chaney in the back and chest, (b) stopping, detaining, and handcuffing Chaney for 10 minutes for no justifiable reason, (c) calling Chaney "dog (dawg)," and (d) otherwise demeaning Chaney in a variety of ways. For these reasons, the Court finds that Lindquist is not entitled to governmental immunity and both the assault and battery and intentional infliction of emotional distress claims are viable at this stage of the proceedings. The Court **DENIES** Lindquist's summary judgment motion as to Chaney's assault and battery and intentional infliction of emotional distress claims.

## V. KEEGO HARBOR'S MOTION FOR SUMMARY JUDGMENT

The Court **DISMISSES** Chaney's equal protection and substantive due process claims against Keego Harbor because there was no underlying constitutional violation by Lindquist with respect to those two claims, and Chaney has not asserted any other basis for an equal protection or substantive due process claim against Keego Harbor. *See,*

*e.g., Hanson v. Madison County Detention Center*, 736 Fed. Appx. 521, 541 (6th. Cir. 2018) ("where no constitutional violation occurs, the municipal defendant likewise cannot be held liable"); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). For the following reasons that follow, the Court also **GRANTS** Keego Harbor's motion for summary judgment on Chaney's Fourth Amendment/*Monell* claim against Keego Harbor.

A municipal defendant can only be subject to direct liability if it causes a constitutional violation and harm to the plaintiff because the municipality "implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by" that body's officers. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983." *Id.* at 694.

A plaintiff cannot allege a viable claim based solely on vicarious liability or respondeat superior. *Id.* at 691. The municipality's policy (or absence of one) must be a "moving force" in the deprivation of the

plaintiff's constitutional rights and such policy must have arisen from "deliberate indifference" to the rights of its citizens. *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996).

In addition to policy or custom, the inadequacy of police training may serve as a basis for Section 1983 liability if the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *Canton v. Harris*, 489 U.S. 378, 388 (1989). The question is "whether the training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'" *Id.* at 390.

As Keego Harbor argues, the evidence in this case consists of a single incident – Lindquist's stop, detention, and handcuffing of Chaney. To survive a motion for summary judgment based on a single incident, Chaney must identify "an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker" that resulted in the alleged unconstitutional actions of Lindquist. (ECF No. 38, PageID.486 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985)).)

The Sixth Circuit requires that a plaintiff "show prior instances of unconstitutional conduct demonstrating that [the municipality] has

ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254–255 (6th Cir. 2010). *See also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."). Chaney and his expert fail to show: (a) any specific facts of prior abuse by Keego Harbor officers; (b) that there were any recurring situations presenting an obvious potential for a constitutional violation that would support a finding of deliberate indifference; or (c) that any policy was the moving force behind any violation of his constitutional rights.

Although there is sufficient evidence to go to trial on whether Lindquist violated the Fourth Amendment, Chaney offers no evidence that Keego Harbor has any improper written policy regarding the Fourth Amendment. Chaney likewise offers no evidence that Keego Harbor had any knowledge of discriminatory conduct by Lindquist – or any other officer.

The best evidence cited by Chaney is Keego Harbor Chief of Police John Fitzgerald's alleged failure to train/discipline with respect to

Lindquist's actions. However, the alleged misconduct that Chaney cites *vis a vis* Fitzgerald's failure to train or discipline Lindquist transpired <u>after</u> Lindquist stopped and detained Chaney. Conduct that transpired after July 14, 201 does not establish that any "policy" was in place on July 14, 2021, such that Lindquist could have acted in accord with it on that date.

Chaney also argues that Fitzgerald stated that he has never disciplined any Keego Harbor officers who were confirmed to have been engaged in misconduct, had department violations, or had complaints sustained against them since Fitzgerald had become Chief of Police. (ECF No. 45, PageID.1139 (citing Ex. 9 (Fitzgerald Dep.) at 77).) But, the record reflects that Fitzgerald testified he was aware of "a couple" of times officers violated rules. (ECF No. 49, PageID.1419 (citing Ex. 1 at 72–73, 76).) Fitzgerald explained that they were handled through non-disciplinary supervisory counseling. (*Id.* at 76–77.) Fitzgerald also explained that the disciplinary action he used was in accord with the police officer's union contract, and the same process is used with part-time officers like Lindquist, because it is the most "fair and equitable way to discipline." (*Id.* at 68–69, 116–117.) The Court also notes that Chaney

did not ask Fitzgerald the reasons for the other violations (*id*. at 76), nor has Chaney supplemented the record to identify the nature of the undisciplined misconduct.

Chaney next argues that Lindquist's failure to follow proper procedures when stopping Chaney was the result of the Keego Harbor Police Department's failure to implement clear rules guiding officers on how to make a lawful arrest. (*Id*.) Chaney further argues that Keego Harbor is liable because it does not have clearly written policies that specify what constitutes an unlawful arrest. (ECF No. 45, PageID.1142.) Chaney asserts that there is no policy that explains the difference between arrest and detainment and asserts that Fitzgerald did not know the difference, either. (*Id*. (citing Ex. 9 at 151–153).)

The Court finds that Chaney has not established a genuine dispute of material fact on this issue. When Chaney's attorney repeatedly asked about policies regarding whether a stop becomes an arrest based upon "how long" it is, Fitzgerald responded, "I don't believe there is an actual set amount of minutes," and agreed Keego Harbor has no policy for "how long a citizen can be detained prior to being deemed arrested." (ECF No. 49, PageID.1420 (citing Ex. 1 at 152–155).) Courts, however, have

rejected a bright-line rule for when a stop becomes an arrest, based upon its duration. *See, e.g., Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999). And, although Chaney's expert (John Peters) opined that a foundational requirement of any police department is a set of clearly written rules, regulations, and procedures (ECF No. 45, Ex. 10),[6] the statistics from various sources cited by Chaney and Peters do not aid Chaney's arguments because those sources are all inadmissible hearsay. *Tranter*, 460 F. App'x at 514.

The Court finds there is no genuine dispute of material fact that supports a claim that Keego Harbor failed to train its officers generally, and Lindquist specifically. Lindquist seemingly was well trained. He has a bachelor's degree in criminal justice, he graduated from the police academy in 2015 (ECF No. 38-5, PageID.820–821), and he has received diversity training. (*Id.* at PageID.52.) In Lindquist's two years with Keego Harbor leading up to the underlying event, Lindquist received the

---

[6] Chaney argues that, as explained by Peters, Fitzgerald's 30(b)(6) testimony demonstrated that Keego Harbor's ongoing pattern, custom and/or policy of not disciplining officers for misconduct (intentionally lying) represents a nexus between Lindquist's pretextual stop of Chaney and the violation of Chaney's clearly established rights. (ECF No. 46, PageID.1284 (citing Ex. 8 (Peters report) at 9).) Peters went on to state that Fitzgerald created and perpetuated an organizational atmosphere that demonstrated bias toward protecting its officers at the expense of citizen's constitutional rights. (*Id.*)

following training: Michigan Legal Updates (May 11, 2020); Introduction to Use of Force (May 18, 2020); Communication and Intrinsic Bias (June 23, 2020); Introduction to Racial Profiling (August 16, 2020); De-escalation for Law Enforcement (January 30, 2021); Felony Stop Training for Non-MSP Members (March 8, 2021); Emotional Intelligence and Duty to Intervene (April 11, 2021); and Interdiction Mastermind (April 19, 2021). (ECF No. 38, PageID.471–472, Ex. 6.)

The Court finds that Keego Harbor's training of its officers (specifically, Lindquist) exceeds what the Sixth Circuit requires. In fact, the Sixth Circuit has "regularly relied on academy training to reject claims against municipalities that offered little additional training themselves." *Gambrel v. Knox County*, 25 F.4th 391, 411 (6th Cir. 2022) (citations omitted).

The Court **GRANTS** Keego Harbor's motion for summary judgment on Chaney's Fourth Amendment/*Monell* claim.

## VI. CONCLUSION

Accordingly,

**IT IS ORDERED** that Lindquist's motion for summary judgment (ECF No. 33) is **GRANTED IN PART and DENIED IN PART**.

**IT IS FURTHER ORDERED** that Keego Harbor's motion for summary judgment (ECF No. 38) is **GRANTED** and Keego Harbor is **DISMISSED** from this cause of action.

**IT IS FURTHER ORDERED** that Chaney's equal protection and substantive due process claims, as well as his official capacity claim, against Lindquist are **DISMISSED**.

**IT IS FURTHER ORDERED** Chaney's Fourth Amendment, assault and battery, and intentional infliction of emotional distress claims against Lindquist **REMAIN BEFORE THE COURT**.

**IT IS FURTHER ORDERED** that Chaney **SHALL AMEND HIS COMPLAINT** by filing a Second Amended Complaint, which shall include a specific claim (and Count) for violation of his Fourth Amendment rights, **within 14 days of the date of this Order**.

Date: September 29, 2023

s/Jonathan J.C. Grey
Jonathan J.C. Grey
United States District Judge

<u>Certificate of Service</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 29, 2023.


<u>s/ S. Osorio</u>
Sandra Osorio
Case Manager